CLARKE, P. J., LAUGHLIN, SMITH and DAVIS, JJ., concurred.

Judgment reversed and complaint dismissed, with costs to the appellant.

---

In the Matter of WILLIAM G. MULLIGAN, an Attorney, Respondent.

First Department, December 1, 1916.

**Attorney at law disbarred — receipt of money from estate of which his wife was executrix — fraud in inducing clients to loan money.**

An attorney at law should be disbarred, where it appears that he was very closely connected in business with his wife; that she in an accounting of an estate in which she had been made executrix, claimed credit for excessive payments to her husband as attorney and for alleged loans, which were disallowed by the court; that on appeal from said decree she obtained a surety bond by inserting in her application material words in a rather obscure interlineation, which words were overlooked by the surety company which was compelled to pay, and that said

First Department, December, 1916.          [Vol. 175.

attorney loaned money belonging to his clients on mortgages repre-
sented to them to be first liens, but which were, in fact, worthless and
subject to taxes, and on which he personally paid the interest, the
mortgagors being mere dummies.

DISCIPLINARY PROCEEDINGS instituted by the Association of
the Bar of the City of New York.

*Einar Chrystie* [*Isham Henderson* of counsel], for the
petitioner.

*Joseph F. Hennessey*, for the respondent.

CLARKE, P. J.:

Respondent was admitted to practice in this department in
June, 1892, and has ever since practiced as attorney and coun-
selor at law, having an office in the borough of The Bronx.

The learned official referee has reported that about the time
of his admission he married one Agnes K. Murphy, who had
then for several years been engaged in the real estate business
in The Bronx, having succeeded to her father's business. Since
then respondent and said Agnes K. Murphy Mulligan have not
only been husband and wife, but have been very closely con-
nected in business. They deny the existence of any actual
partnership between them, but their testimony amply demon-
strates that their affairs and interests are so clearly interwoven
that respondent's endeavor to avoid censure in certain matters
to be considered by placing the responsibility therefor on his
wife can be afforded but little consideration. It appears that they
conducted their business in and from the same office, and that
they use office stationery with the heading " Office of William
G. Mulligan, Attorney and Counsellor at Law — Agnes K.
Murphy Mulligan, Broker and Appraiser, Real Estate Loans
and Insurance." Mrs. Mulligan was the chief witness for the
respondent and testified not only as to transactions in which
she admitted having taken part, but as to practically all of
the business of the respondent. She testified: " We [Mr. and
Mrs. Mulligan] have not been separated more than two hours
at a time in the twenty-four years we have been married. Our
business has called us together and I have at all times been
with Mr. Mulligan."

The first charge is in substance that one Hartmann died in 1911,

leaving a will whereof said Agnes K. Mulligan was executrix; that the respondent assisted her in an attempt to convert $6,785.33 from the Hartmann estate by a claim in her accounting that she had paid same to him partly as a fee for alleged legal services and partly in satisfaction of alleged loans by respondent to Hartmann; and her account was objected to and that the surrogate sustained such objections and surcharged the executrix with $6,785.33 which he found she had paid to respondent in bad faith. The decree entered upon these findings was affirmed by this court (165 App. Div. 912) and by the Court of Appeals (216 N. Y. 720). The facts found were as follows: Into Mrs. Mulligan's possession as Hartmann's executrix there came an estate of $19,886.46, consisting of a $10,000 mortgage, with interest, some $3,600 cash, a promissory note of Agnes K. Mulligan and respondent for $4,000 and interest, assigned by John P. Wenninger to decedent. The executrix's account showed a payment to her husband for disbursements, money loaned and professional services rendered to Hartmann of $7,075.33; further, that the executrix had not collected the $10,000 mortgage, but had extended the time of payment, and that the residuary legatee and widow of Hartmann had not received a penny. The amount of respondent's claim for services and money loaned just about offset the amount of cash in the estate, plus the Mulligans' own promissory note. The surrogate disallowed the payment to respondent of all but $250, charged the executrix with the bond and mortgage and interest and the Mulligans' $4,000 note, with interest, making the total estate $19,886.46, credited her with $889, and leaving a cash balance in her hands of $18,997.46 to be paid over to the residuary legatee. He disallowed any commissions, costs or disbursements to the executrix, and found that the sum of $6,785.33 was paid to respondent in bad faith.

The learned official referee, upon evidence taken before him, concurred in the opinion of the surrogate and his estimate of the value of the services alleged to have been rendered to Hartmann, and that the evidence both before the surrogate and before the official referee was insufficient to prove that loans claimed to have been made to Hartmann had ever been made.

The referee reports that "Irrespective of whether the use

First Department, December, 1916.    [Vol. 175.

which he made of the moneys which respondent must have counselled or procured his wife and client, as executrix, improperly to pay to him, constitute a conversion by him, by Agnes K. Mulligan alone, the two together, or not at all, I am of the opinion that for an attorney to instigate, permit, profit by or take part in such transactions as these amounts to gross professional misconduct.   There is and was a way, if respondent's alleged claims against the Hartmann estate could be established, to do so by legal and proper methods, which would have left the attorney beyond the possibility of criticism. The method followed, which might well be characterized as stupid as well as dishonest, furnishes a strong probability that respondent and his astute consort, being unable or unwilling to account to the Hartmann estate for the $3,600 cash, or to pay the promissory note, arranged this futile method of covering their tracks.   There need be no discussion of the technicalities of conversion when it is admitted that respondent and his wife took and used the Hartmann money for their own purposes; and it appears as well that it has not been paid back by them, nor has Mrs. Mulligan ever complied with the decree and direction of the Surrogate's Court."

Mrs. Mulligan appealed to this court from the surrogate's decree.   To stay execution she had to give bond.   At the last moment she applied to a surety company, producing one Catherine Maguire, who according to Mrs. Mulligan's testimony, assigned three mortgages to the surety company as indemnity upon Mrs. Mulligan's word of honor that she would be secured, which three mortgages were represented as worth their face value of $20,500.   Miss Maguire signed the application, and Mrs. Mulligan inserted therein in her handwriting the words "the indemnitor [*i. e.*, Maguire] further agrees to procure title company search showing said mortgage to be, when recorded, first liens on the premises described therein." Mrs. Mulligan represented these mortgages to be first liens and good indemnity, but the surety company and its agents overlooked the words "*when recorded,*" which had been inserted in a rather obscure interlineation.   In fact, the mortgages were ten or twelve years old, and each was subject to some ten years' taxes, amounting to over $10,000.   This error

has been atoned for by the surety company, for it was obliged to and did pay the residuary legatee in full. When it attempted to foreclose on its all but worthless security, respondent appeared for said Maguire, and did what he could do in opposition to delay such foreclosures. This is the transaction which respondent advances as exonerating Mrs. Mulligan, and, therefore, himself from the effects of the surrogate's decision and decree.

The facts in regard to the second charge which the official referee has sustained are as follows:

In 1905 Wenninger and Mrs. Mulligan and respondent were the joint owners of the Quarry road property. In 1909 Mrs. Mulligan procured one Dickinson to make a loan of $7,000 as executor of Louisa H. Dickinson, deceased, on this property. At this time there were taxes, etc., against this property to the extent of $6,690.22 and its highest value was $11,250. The loan was to be made by Dickinson to McKiernan who was clearly shown not to have been the real owner of the property. The latter testified that Mr. and Mrs. Mulligan sent for him and asked if he would assume a mortgage on this property; that they owned it, but did not want to appear in the matter. The closing took place at respondent's office, where were present Dickinson, Wenninger, McKiernan, respondent and his wife and other persons. A deed from Wenninger and his wife was delivered and McKiernan executed the $7,000 bond and mortgage to Dickinson as executor and received Dickinson's check for $7,000 to his order, which he indorsed in blank and turned over to respondent. Respondent also indorsed it, but it is not apparent what became of the money, though some of it was presumably used to pay off prior mortgages on the premises. At all events respondent did not pay any of the accrued taxes on the property with it.

McKiernan and Wenninger testified in substance that Dickinson said that he relied on respondent to see that there were no incumbrances on the property. Respondent denies this; says that an attorney named Randall represented Dickinson, and that he did not represent Dickinson. In view of the fact that there were then nearly $7,000 of taxes on the property, this contention is hardly credible. If Dickinson had

known of this he would scarcely have made the loan. And the fact that three years afterward Dickinson retained respondent to foreclose the mortgage shows that he was relying on respondent throughout. The complaint in the foreclosure action verified by Dickinson as plaintiff before Mrs. Mulligan as notary is significantly silent on the subject of unpaid taxes; it is based on a default in interest. If we accept the premise that respondent was interested in the property we cannot avoid the conclusion that he participated in or instigated the fraud, or at least concealment, perpetrated upon Dickinson in inducing him to make the loan in question.

On March 14, 1912, respondent stated in a letter to Dickinson that the property is worth at least $35,000, so that the security is ample for any assessments or taxes unpaid. But respondent did not cause the summons and complaint to be served until the fall of 1912 and did not file a *lis pendens* until April, 1913. Dickinson died in or about February, 1913, and the administrator *de bonis non* of the estate of Louisa H. Dickinson substituted other attorneys for the respondent and the foreclosure resulted in a very large deficiency, there being some $10,000 of taxes.

The referee reports that the conclusion cannot, to his mind, be avoided that respondent throughout concealed from Dickinson, his client, that there were large amounts of taxes on the property on which respondent's wife had induced the making of the $7,000 loan, and his ill-explained delay in the foreclosure probably was due to a desire to keep Dickinson in ignorance as long as possible.

The third charge which the official referee finds sustained avers in substance that in July, 1903, Matilda Leuchtenburg intrusted to the respondent $1,000 to be invested in a first mortgage; that she had known respondent for a number of years and trusted him to look after her interests in such transaction; that thereafter respondent delivered to her a certain $1,000 bond and mortgage dated July 24, 1903, on property in The Bronx, executed by Maggie L. Cales, assuring her that it was a good first mortgage and a safe investment; that Mrs. Leuchtenburg and her husband did not know and had never seen the mortgagor who respondent admits was merely act-

ing as a dummy; that whatever interest was received by them on such mortgage was paid by respondent, who assured them that he was looking after their interests in the matter; that in August, 1912, the Leuchtenburgs discovered that there was a prior mortgage for $3,500 on the same premises and that taxes, etc., from 1905 amounting to about $1,242 had been allowed to accumulate against the property; and that they have received no part of the $1,000.

It is further alleged that in November, 1903, Mrs. Leuchtenburg intrusted to the respondent $1,500 to be likewise invested in a first mortgage under similar circumstances; that she received a mortgage on Bronx property executed by one Michael Fell, November 14, 1903; that Fell was a dummy unknown to the Leuchtenburgs; that respondent paid whatever interest they received; that he falsely represented that it was a first mortgage and recorded; that there were two prior mortgages on the premises, and taxes, assessments, etc., which rendered the Leuchtenburgs' mortgage worthless. There is a similar averment concerning a $5,000 mortgage executed to the Leuchtenburgs by Daniel F. Callahan.

The referee reports that Mrs. Leuchtenburg appears to be a thrifty, working woman, who had been employed in menial tasks by Mrs. Mulligan, and known her and the respondent since 1888. Her testimony is largely corroborated by documentary evidence and by the probabilities, while the evidence of respondent and his wife in contradiction thereof is subject to the criticism of evasiveness and lack of documentary corroboration. In any aspect it sufficiently appears that respondent in several instances received moneys from Mrs. Leuchtenburg for investments in bond and mortgage, and paid to her interest upon such investments, and that the premises upon which such mortgages were placed were either then or subsequently became subject to very large amounts of taxes, assessments, etc. "It is needless to say that respondent was bound to disclose such taxes to Mrs. Leuchtenburg, if he knew of them, or if not, to ascertain them before investing her money in such attenuated security. I am convinced that respondent did not act in good faith in the matters of the Cales, Fell and Callahan mortgages, and on the whole I am inclined to accept

Mrs. Leuchtenburg's statement that respondent represented and stated to her that they were first mortgages. Respondent's own testimony and explanation as to the Leuchtenburg mortgage is brief, vague and unsatisfactory."

"In view of all the facts and circumstances and inherent probabilities, and especially in view of the intimate co-operation of the respondent and his wife in their real estate transactions, I cannot acquit the respondent of responsibility, but am forced to the conclusion that as against Mrs. Leuchtenburg, who implictly entrusted everything to him, he has been guilty of gross professional misconduct, and that the charge under consideration has been sustained to the extent above set forth."

We have carefully examined this voluminous record and the exhibits and are satisfied that the conclusions of the learned official referee are sustained by the evidence in respect to the charges hereinbefore alluded to. We approve of the conclusions of the referee and in our opinion the respondent has clearly been guilty of such misconduct in his professional relations as an attorney as stamps him as unfit to continue to be a member of the honorable profession of the law. He is, therefore, disbarred.

SCOTT, DOWLING, SMITH and PAGE, JJ., concurred.

Respondent disbarred. Order to be settled on notice.